W. R. DUDLEY, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, October 8, 1912.

1. RAILROADS: Crossing Accident: Failure to Give Signals: Prima Facie Case: Burden of Proof. In an action against a railroad company for death by wrongful act, resulting from a train striking decedent at a public crossing, evidence that the bell on the engine was not rung nor the whistle sounded, as required by Sec. 3140, R. S. 1909, establishes plaintiff's right to

recover, prima facie, and the burden of proving nonliability then shifts to defendant; and the refusal to direct a verdict for defendant is proper, unless its nonliability is affirmatively and conclusively established by the evidence.

2. **EVIDENCE: Admissions: Conclusiveness.** Where, in an action for the death of plaintiff's child as a result of a train striking a buggy driven by plaintiff at a crossing, defendant offered evidence that, immediately after the accident, plaintiff admitted that he saw the train approaching, but thought he could cross ahead of it, plaintiff's failure to deny or explain such statements was not conclusive of the fact alleged to have been admitted by them.

3. ———: ———: ———: **Question for Jury.** Where a witness testifies to certain admissions made by plaintiff, from which an inference could be drawn which would preclude a recovery, but plaintiff testifies positively to the contrary, plaintiff should not be denied a recovery as a matter of law, but the question should be submitted to the jury.

4. **RAILROADS: Crossing Accident: Contributory Negligence: Question for Jury.** In an action against a railroad company for the death of plaintiff's child as a result of a train striking a buggy driven by plaintiff, in which decedent was riding, at a public crossing, on a dark night, *held* that not only was there no conclusive showing that an obstruction caused by weeds growing along the right of way ceased in time to let plaintiff see and keep off the track, but there was a sufficient showing to justify an affirmative finding that the headlight on the engine did not come into view until the horses were on the track, at which time the train was so near that plaintiff did not have time to drive off of the track before the buggy was struck; and hence it is *held* that the question of whether plaintiff was guilty of contributory negligence was properly submitted to the jury.

5. ———: ———: **Failure to Give Signals: Contributory Negligence.** In an action against a railroad company for injuries received by being struck by a train at a public crossing, where proof is offered that defendant failed to give the statutory signals, it must appear, in order to convict plaintiff of contributory negligence in failing to hear and heed the noise made by the train, not only that the train made a noise (whether by proof or judicial notice is immaterial), but that the circumstances were not such as to prevent him from hearing it or to excuse him from not heeding it; and the burden of proving such circumstances is on defendant.

6. ———: ———: **Contributory Negligence: Failure to "Stop, Look and Listen."** Where, in an action for the death of plaintiff's daughter in a collision at a public crossing on a dark night, between a railroad train and a buggy driven by plaintiff,

Dudley v. Railroad.

in which decedent was riding, it appeared that plaintiff was unfamiliar with the crossing, never having traveled the road before, it could not be said, as a matter of law, that he was negligent in failing to know that his view of the track was obstructed, and in failing to stop and make a more careful observation for approaching trains, before undertaking to drive over the crossing.

7. **NEGLIGENCE: Contributory Negligence: Intoxication.** In an action for the death of plaintiff's child, resulting from a buggy, in which she was riding and which was driven by plaintiff, being struck by a railroad train, evidence *held* insufficient to conclusively establish that plaintiff had been made careless by drinking before the collision.

8. **DEATH BY WRONGFUL ACT: Suit by Parent for Death of Child: Necessity of Proving Child was Unmarried: Evidence.** In an action by a parent for the death of a minor child, under Sec. 5425, R. S. 1909, it is necessary for plaintiff to establish that decedent left no husband or minor child surviving her, and it will not be presumed, in aid of such proof, that a female child, twelve and a half years of age, had never been married, since she might lawfully have contracted marriage at twelve years of age; but the marriage of a child at that age is so improbable that slight evidence will be sufficient to establish the contrary, and such evidence need not be direct and positive but may be shown by facts and circumstances or by tacit concession at the trial.

9. ————: ————: ————: ————: **Sufficiency of Evidence.** In an action by a father for the death of his daughter, twelve and a half years of age, under Sec. 5425, R. S. 1909, where it was shown that she lived with plaintiff and bore his name, and she was referred to by counsel and witnesses in terms usually applied to a little child and totally inconsistent with the idea that she was a married woman, while married women were referred to by their title of "Mrs.," it was sufficiently proved and conceded that she was unmarried and left no minor child surviving her to authorize plaintiff to maintain the suit.

10. **APPELLATE PRACTICE: Trial Practice: Unresponsive Answer to Question: Remedy.** A party will not be heard to complain on appeal that an answer given by a witness was not responsive to the question, unless he moved to strike it out on that ground.

11. **EVIDENCE: Conclusion of Witness.** In an action for injuries received by being struck by a railroad train at a public crossing, a witness, in response to a question as to whether he had "observed, in passing over the crossing, about how close you would be to the south rail before you could see up," answered: "A man would have to be within five feet of the crossing, of

the south rail of the crossing, on account of the growth on the right of way and on the side of the right of way, . . . . there's quite a lot of tufts of grass growing over the sides of the embankments." *Held*, that the office of the answer was to show how nearly the obstructing embankment and vegetation extended along the side of the road and up to the railroad track, and hence it was not a mere conclusion.

12. **TRIAL PRACTICE: Incompetent Evidence: Motion to Strike Out: Necessity of Definiteness.** Where portions of a witness' testimony is rendered incompetent by answers he gives on cross-examination, it is proper for the party conducting such examination to point out the incompetent statements and to move to strike them out; but where a motion to strike out is made, which is so broad and indefinite that it would, if sustained, have the effect of striking out all of the witness' testimony, it should be overruled, even though some of his testimony is incompetent.

13. **EVIDENCE: Grass and Weeds: Sufficiency of Identification.** Where, in an action for death in a railroad crossing accident, it was claimed that the view of the train was obstructed by grass and weeds growing on the right of way, and weeds and grass taken from the place and tied into bundles were properly identified, and the difference between their appearance when growing and at the time they were exhibited was explained to the jury, it was proper to admit them in evidence, over an objection that they were not in the same condition as when they were standing on the ground; their difference in appearance being for the jury in determining the weight to be given to them.

14. **DEATH BY WRONGFUL ACT: Measure of Damages: Instructions: Nondirection.** An instruction, in an action for death at a railroad crossing, brought under Sec. 5425, R. S. 1909, that, in case the jury found for plaintiff, their verdict should be in a sum not less than $2000 and not exceeding $10,000, was correct in its general scope, and the failure to instruct the jury that they should arrive at the amount of their verdict by the exercise of a sound discretion, giving consideration to the extent of the injury, so as to give effect to the remedial side of the statute, and to the facts relating to the acts of negligence, so as to give effect to its penal side, was mere nondirection, for which the court could not be convicted of error, in the absence of a request by defendant that the omission be supplied.

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett*, Judge.

Affirmed.

*Robertson & Robertson* for appellant.

(1) The court erred in refusing to direct a verdict for the defendant at the close of the evidence for the plaintiff, and at the close of all the evidence. (a) The plaintiff's contributory negligence, he being the beneficiary under the statute attempting to recover damages, bars a recovery. Cogan v. Railroad, 101 Mo. App. 179. This is the theory on which the case was tried. Reilly v. Railroad, 94 Mo. 600; Koons v. Railroad, 65 Mo. 592; Hook v. Railroad, 162 Mo. 569. (b) Plaintiff's evidence is to the effect that he heard no signals and did not see the train, and that as he went on the track the train was not over thirty feet away with the headlight lit. His evidence is contrary to the physical facts. Hook v. Railroad, 162 Mo. 569; Sanguinette v. Railroad, 196 Mo. 466; Payne v. Railroad, 191 Mo. 215; Kelsay v. Railroad, 129 Mo. 362; Hayden v. Railroad, 124 Mo. 566. (c) The experiments made by plaintiff's witnesses were made in the day time and were of no value to determine whether a headlight could be seen through the weeds. If Maxey and Miss Maxey saw the headlight, then plaintiff could have seen it. Newton v. Railroad, 152 Mo. App. 167. (d) After the accident, plaintiff admitted to numerous persons that he saw the train before he went upon the track. Under all the circumstances, the admissions being evidence that the plaintiff saw the train, the plaintiff failing to explain or to deny the admissions, such statements become for the purpose of this case just as if they were plaintiff's own testimony given upon the witness stand; and the plaintiff stands in this case with nothing more in his favor than evidence that he did not see the train, contradicted by his own evidence of a much stronger character that he did see the train before he went upon the track. His evidence, therefore, is a *felo de se*. It is too contradictory to be of the slightest

value. Oglesby v. Railroad, 150 Mo. 177. (e) There was no evidence in this case that plaintiff's deceased daughter was single and unmarried and that she left her husband or minor child or children surviving her. This proof was necessary to a recovery by the father. (2) The court erred in allowing the witness Pritchett to state that he thought a person would have to get within five feet of the south rail to see up the track. Roscoe v. Street Railway, 202 Mo. 595; Saylor v. Railroad, 185 Mo. 239; McAny v. Henrici, 141 S. W. 633. (3) The court erred in admitting in evidence the bundle of weeds on behalf of the plaintiff. (4) The court erred in refusing defendant's instruction No. 4. To move to a crossing at a rapid rate of speed where the view was obscured is negligence; and ordinary care requires that when one cannot see he should stop to make more careful observation. (5) The court erred in giving plaintiff's instruction 3. Boyd v. Railroad, 236 Mo. 54.

*Barclay, Fauntleroy & Cullen* and *E. S. Gantt* for respondent.

(1) When the statutory signals are not given and a collision occurs at a crossing, it is presumed that this negligence caused it, and the burden is on the defendant to prove otherwise. Byars v. Railroad, 141 S. W. 926; McNulty v. Railroad, 203 Mo. 475. (2) Every one is presumed to be in the exercise of due care for his own safety until the contrary is shown. Dunlap v. Chemical Works, 139 S. W. 828. (3) This presumption is not overcome by proof of a crossing collision; the burden is on the railroad company to prove contributory negligence to overcome this presumption. Byars v. Railroad, 141 S. W. 926. (4) The court committed no error in refusing appellant's fourth instruction. There is no proof that any circumstances interfered with plaintiff's hearing or that he knew of the obstruction. Russell v. Railroad, 70 Mo. App. 88. (5)

And whether or not a traveler should stop, look and listen, is a question for the jury in view of all circumstances. Moore v. Wabash, 137 S. W. 7; Smith v. Railroad, 150 Mo. App. 1; Frank v. Transit Co., 99 Mo. App. 334; Elliott v. Railroad, 105 Mo. App. 532. (6) Pritchett's evidence that you would have to get within five feet of the south rail to see three hundred feet west on the track is competent. This is a statement of fact and not an opinion or a conclusion. Railroad v. Robey, 118 Ill. App. 324; Innis v. Steamer, 4 Cal. 5; Mitchell v. Railroad, 138 Ia. 283; Railroad v. Shannon, 76 Ark. 166; Railroad v. Sanders, 99 S. W. 1109; Railroad v. Hagenbeck, 8 N. E. 1016; Railroad v. Watson, 90 Ala. 41.

STATEMENT.—This is an action by the plaintiff against the defendant under section 2864, Revised Statutes 1899, as amended (Laws 1905, p. 135), for damages on account of the death of plaintiff's daughter, Eunice Dudley, who, while riding in an ordinary open buggy with plaintiff, was struck upon a much-traveled public road crossing in the western part of Martinsburg, Missouri, by one of defendant's eastbound freight trains. Plaintiff had verdict and judgment for $2500 and the defendant has appealed.

The allegation of negligence upon which the case went to the jury is that defendant failed to give the statutory signals by bell or whistle while approaching the crossing. The answer contained, first a general denial, and then a plea that plaintiff was guilty of contributory negligence in driving upon a public crossing in front of defendant's train when he saw and heard or could by the exercise of ordinary care have seen and heard said train in time to have remained off of said track and in a place of safety with his daughter. There was ample evidence that defendant failed to give the statutory signals as charged. The question is whether the state of the evidence is such as to convict

plaintiff of contributory negligence as matter of law.

The defendant's right of way runs approximately east and west through Martinsburg. Approaching the town from the west and coming toward the "North Road," where the plaintiff's daughter was killed, the railroad track slopes down hill to a point about 2000 feet from, and eight feet lower than, said North Road. It then runs up an incline for said 2000 feet to said road, which as already mentioned is eight feet higher than the foot of the incline. Nearing the road it runs through a "cut" for about 400 feet, then out of the cut while crossing a little "swag" in the ground surface, and then approaches the North Road in and through another cut which is about 400 feet long and has embankments on either side which are each about four feet high above the rails. On the south side or the side from which plaintiff approached the railroad track, the top of the embankment is about fifteen feet from the south rail, though it slopes from there toward the track. Such embankment extends west along the railroad track about 400 feet. The northern six or eight feet of the top of the embankment is the highest, being there about four feet high on account of the earth thrown up from the cut. From thence south the natural ground is at least three feet higher than the rails and gradually declines "a little bit, not much," toward the south, falling a foot or two in 300 feet. Such embankment comes east to within thirty feet of where a wagon would travel along the North Road. This eastern end of the embankment is in the neighborhood of four feet above the North Road at its northern edge and gets slightly lower, perhaps within three feet as it extends back southwardly. Peyton's drug store is on the southeast corner of First and Washington streets in the eastern part of the town and about 375 feet south of the railroad track. Washington street runs parallel to the railroad track. The way from Peyton's drug store to the "North Road" crossing,

at which plaintiff's daughter was killed, ran west along Washington street about 1000 feet to and across a little culvert, and then diagonally, northwest and uphill, about 500 feet, along a traveled road to the North Road, and along it north about 100 feet. At the crossing, on the west or left side of the North Road, is a cattle guard, from which a plank fence four feet high runs some twenty feet south and up on the embankment. At the time when plaintiff's daughter was killed, behind this fence, on the northern slant of the embankment, and on top of the embankment and higher ground for a considerable distance west, was a growth of resin weeds and prairie grass. According to plaintiff's witnesses this growth was dense and high, six to eight feet high, above the embankment and higher ground, and effectually obstructed the view to the west along the track as one approached from the east and south along the way we have described. As one started up the incline from the culvert and looked northwest, he could just see the tops of the telegraph poles along the right of way, even after the weeds and grass had been cut off.

On August 7, 1909, plaintiff, a widower, and his two children, Zella and Eunice, spent the day at a picnic in New Florence, Missouri. He and his said children lived together with Lute Diggs, a farmer, from whose farm they had come into Martinsburg that morning over the North Road and had taken the train from Martinsburg to New Florence, putting up the buggy and team at the livery barn in Martinsburg. About 9:00 o'clock that night the two girls waited at Peyton's drug store while he went and got the rig. From Peyton's drug store, going home by way of the North Crossing, they followed the way we have traced above, that is, they went west along Washington street until they came to and crossed the little culvert and then took the diagonal road to the North Road and thence north down towards the railroad crossing. The

plaintiff was driving, Zella, who was fifteen years old, was sitting beside him with the little girl, Eunice, who was only twelve and a half years old, sitting on her lap. The buggy had no top to it. The ponies were going at a little trot. Both plaintiff and his daughter Zella testified that as they went along from Peyton's drug store they did not see the headlight of the train coming from the west although they were looking in a generally westward direction all the time until they turned north to go over the crossing. They were corroborated in this by one Erret Oliver who followed after them and had reached the culvert about the time when the collision occurred. He testified that he did not see any light from the engine. As they got near the crossing, Zella called plaintiff's attention to the fact that they were approaching the railroad track and each of them testified that thereafter, until they got right on the track, they kept looking first one way and then another for signs of an approaching train and saw nothing. We may say that the plaintiff was not familiar with Martinsburg and its surroundings, having come in over the North Road across the railroad track that morning for the first time. The team went at a slow trot until they got right at the track and plaintiff checked them up a little as they came to it. The team was on the track and the wheels of the buggy just about at the south rail when he first saw the headlight which seemed to be not more than twenty or thirty feet west of the crossing. Seeing it, he reached for the buggy whip, thinking he would try to get across. The engine struck the buggy about that time. The little girl, Eunice, was killed. Zella was severely injured.

One of plaintiff's witnesses, Lute Diggs, made an observation approaching the track in a buggy like the one in which plaintiff's daughter was killed, and he testified that he had to drive to a point where the horses' heads were on the south rail before he could

see up the track any distance at all and then he could see only thirty to forty feet. Dr. Divan testified that shortly before this collision he had had his attention called to the condition of the crossing as to whether or not he could observe trains coming from the west, as follows: He approached the crossing going north in an automobile as a train came from the west and, though he was looking for the train all the time, he got within ten or fifteen feet, "right on the track," before he observed the engine; got so close he could not stop and went on across. At that time the train was probably 100 yards away. He was going five or six miles an hour. Two other witnesses for plaintiff made observations in an automobile, approaching the crossing along the way we have described. One testified that he could not see an engine up the track to the west until he got within sixteen or eighteen feet of the south rail, and then he could see only sixty or eighty feet up the track. The other testified that he had to get within eighteen or twenty feet of the south rail before he could see an engine and not then unless it was within seventy-five or eighty feet of the crossing. Just where the train with which plaintiff collided was when he was within sixteen to twenty feet of the track is not disclosed. It does appear, however, that the train approached the crossing at a speed variously estimated at from thirty to fifty-five miles an hour, while plaintiff approached it at a slow trot; also that though the plaintiff and his daughter, and Maxey and his daughter, two of defendant's witnesses whom we will mention further, were looking for it, none of them saw the headlight until their horses were upon the track.

On behalf of defendant several witnesses testified that they saw the headlight of the engine as they looked toward the west, but none of them were in a position to have their view obstructed as was the plaintiff, except Watkins, who testified that he made an

observation from the road as it approached the cross-
ing and found that a headlight would show through
the weeds and grass. He had worked for the defend-
ant twenty-eight years, and at the time of the trial
had three sons working for it. Two other witnesses,
William Maxey and daughter, testified that they drove
toward the crossing that night along the way we
have traced, immediately in front of the plaintiff's
rig. They stated that from about the culvert they
looked to the west and saw the light of the train—not
the headlight, but a reflection in the sky, "a blush in
the heavens," above the obstructions. Maxey testi-
fied that it was "very dark," "an awful dark night."
He testified that he did not see the headlight itself and
could not get a view of it until he was right up to the
track; his team was on the track when the headlight
flashed in his face. His daughter's testimony was to
the same effect. He saved his conveyance from a colli-
sion only by a rapid whirl to the left. At that moment,
plaintiff's team and buggy, following, were struck.

As the defendant's counsel seems to place a dif-
ferent construction upon the testimony of the witness
Maxey and his daughter, we here set forth the perti-
nent parts thereof.

Direct examination of William Maxey: "Q. I
will get you to state if in approaching that crossing
there where the accident occurred you saw any train?
A. I saw the light of the train before I got to the cross-
ing." He then states that he was about at the bridge
or culvert we have mentioned when he first saw the
light. "Q. When you got down there and first saw
the light of the train you still drove on towards the
crossing? A. Yes, sir. Q. I will get you to state,
you drove on the crossing, did you? A. I drove on to
the crossing, yes, sir. Q. When you got onto the
crossing what did you do? A. I saw the train close
to me and I whirled my team away from it on the
south side of the railroad. Q. I will get you to state

if you saw any person there in a buggy? A. No, sir, I didn't see any. Q. You didn't see any? A. No, sir, not at that time. Q. Well, did you see anybody afterwards? A. I saw them there when the train struck them. Q. Where were they? A. They were right on the track. Q. Right on the track? A. Yes, sir. Q. Now describe to the jury how you drove up there and how you turned? A. I drove up going kind of northwest course, the road runs up a little slope to the track, and I saw the train was too close to me to venture over and I whirled my team south. Q. Which way did you turn? A. I turned to my left."

Cross-examination: "Q. And you simply got a glimpe of the headlight at the bridge (culvert)? A. Somewhere along there. Q. And drove on, and of course having seen the headlight down there you knew there was a train in the neighborhood? A. Yes, sir. Q. And you were listening and looking for the train and aiming to guard yourself against it? A. Yes, sir." . . . "Q. And you did drive up to within about twenty feet of the rail, didn't you? A. I didn't know how far; it was dark; I know I drove until I could see the headlight flash in my face. Q. The headlight flashed on you suddenly and you became somewhat excited and pulled your horses to the left or south? A. Yes, sir. Q. And as the headlight lighted up the space in front of you you saw Dudley's team on the track right ahead of you? A. Yes, sir. Q. And it was struck? A. Yes, sir. Q. You turned off to the left or to the south? A. To the left. Q. Now you never heard any bell or any whistle on that train as it came down there at all, did you? A. No, sir, I never heard anything of the kind. Q. And not until it was in the act of striking the Dudleys did it whistle? A. That's right. Q. And you were listening and aiming to guard your own conduct by the sound of whistle or bell? A. Well, I thought I could cross, that's all I was aiming to do. Q. And not hearing any bell or

whistle, you didn't think it was as close as it was? A. I didn't think it was as close at it was. Q. And when it did dawn on you danger was there, it flashed on you suddenly? A. Yes, sir. Q. And the light from the headlight showed Dudley's buggy on the crossing? A. Yes, sir. Q. It was so dark before that you couldn't see, a dark night? A. Yes, sir, it was an awful dark night. Q. And you drove at rather a rapid trot. A. Drove tolerably pert, yes, sir. Q. You couldn't tell what rate Mr. Dudley was driving, you didn't see him? A. No, I didn't know he was anywhere about. Q. After getting that first gleam of the headlight when the train was about a mile away, you don't remember of seeing that headlight any more until it flashed on you? A. I don't remember noticing only the light of the headlight in the sky; that's all I recollect. Q. You don't mean to be understood as saying you saw the headlight itself; you think you saw probably lighting up? A. Yes, sir, but I never noticed the headlight until I drove up on the track. Q. You saw the headlight as a headlight when at the bridge? A. No, I didn't see any headlight at the bridge; I saw the light from the train. Q. Just saw sort of lighting up above the track. A. Yes, sir. Q. You never saw the headlight at all? A. Not until I got right up to the track, then I saw the headlight. Q. And you never could get a view of the headlight and didn't get a view of the headlight itself until it was in the act of striking the Dudleys? A. No, sir."

Cross-examination of Miss Maxey: "Q. Do I understand you to say you kept your eye on that headlight from the time you went down onto the bridge (culvert) until your father turned? A. Not the headlight; I did the light from the train. Q. You mean you saw a flush in the heavens above the obstructions? A. Yes, sir. Q. But you couldn't see the headlight proper? A. No, sir. Q. And didn't except at first? A. No, sir. Q. Now at the time your father drove

up there and approached the crossing there was considerable excitement in your vehicle, wasn't there? A. Yes, sir. Q. Your father was very close to the railroad track before the headlight came into view? A. Well, I thought so. Q. And your father wheeled his team towards the south and west almost instantly and got away from the track? A. Yes, sir. Q. And just as he wheeled, the light of the engine made the crossing light and you saw a vehicle on the crossing that was being struck by the oncoming engine? A. I didn't see it until after I turned. Q. Well, just in the act of turning? A. Yes, sir. Q. You saw it and saw the engine strike it? A. Yes, sir." . . . "Q. How close, Miss Maxey, do you think your father was to the track when the headlight came in view? A. I couldn't say. Q. Well, could you estimate any distance? A. No, sir, I don't know anything about such as that; of course it was dark; I couldn't see; we must have been close; that's all I can say. Q. And how close was the engine carrying the headlight when he turned, in your judgment; very close? A. I couldn't say; I was excited and it seemed close to me. Q. It seemed close to you? A. I couldn't swear how close it was. Q. Couldn't swear how close, but your father had barely turned when it crossed the crossing. A. Yes, sir."

A Mr. Obushon, to whose house the girl that died was brought, testified that plaintiff told him the next morning, in substance, "that when he approached the track he saw the engine and it was close and he tried to make it and it caught him before he got there." The conductor and brakeman on the train testified that when they got off and found the plaintiff he told them in effect that he saw the train coming but thought he could beat it across the track. William Moore testified that he heard this conversation, adding to it that plaintiff said "the girls tried to get him to stop," and that the next day plaintiff said "he saw the light but

he thought it was a quarter mile away, but when he got up on the track he found out it was closer; he thought he could make it until it was too late.'' On this witness's redirect examination it seemed to be his idea that plaintiff was right upon the track when he first saw the headlight. H. G. Hilkemeyer testified that plaintiff told him the girls begged him not to cross the track, but that he thought he had time enough to make it. Another witness stated that when plaintiff came to the place where Zella was lying, Zella asked the plaintiff if her sister had not screamed and asked him not to cross the track and he answered, ''Yes, but I thought I could get across the track and so did the team.'' Plaintiff was not cross-examined at all and was not recalled to be interrogated as to the statement attributed to him by defendant's witnesses.

The court gave several instructions at the instance of plaintiff and defendant respectively, but refused to give one offered by the defendant as follows:

''The court instructs the jury that a traveler upon a public highway at a crossing over a railroad track is bound to use caution and care for his or her own safety; that the presence of the railroad itself is a warning to such traveler of the danger of going upon the track at a crossing, and that it was the duty of the plaintiff when approaching said track to look and listen for an approaching train, and if an embankment and vegetation growing upon said embankment would prevent his seeing an approaching train in near approach to the crossing, then it was his duty not only to look and listen but to stop and look and listen; and the court instructs you that if the plaintiff, the driver of the vehicle, went onto said public crossing without looking and listening for an approaching train, and if the said embankment and the vegetation between him and the railroad prevented his seeing an approaching train, and he went upon said crossing without stopping to look and listen for an approaching train, when

by doing so he could have discovered the approach of said engine and train, but went upon the track and thereby caused his daughter to be struck and killed, then this plaintiff cannot recover and you will return a verdict for the defendant.''

Other matters will be noticed in the opinion proper.

CAULFIELD, J. (after stating the facts).—I. Defendant assigns as error the trial court's refusal to direct a verdict for the defendant. Such refusal was proper unless defendant's nonliability was affirmatively and conclusively established by the evidence. Where, as here, the evidence showed an injury at a public crossing by a train colliding with a person driving across the track, when the bell was not rung or the whistle sounded, a prima facie case was made, and the burden of proving nonliability was then shifted to the defendant. [Weigman v. Railroad, 223 Mo. 699, 123 S. W. 38.]

The only suggested basis for defendant's claim of nonliability is, that plaintiff was negligent in going upon the track in front of the moving train when he saw or by the exercise of ordinary care could have seen the train in ample time to avoid going upon the track into danger. Did the evidence conclusively show this? There is no evidence that plaintiff actually saw the train or its headlight before his horses were upon the track and it was too late to get across or back up (the train struck before he could even reach his whip), except the statements attributed to plaintiff as having been made by him the night of the tragedy and the morning after. Defendant argues that plaintiff's conduct in failing to deny or explain such statements amounts to an admission that he made them. We need not discuss that proposition. If he made them, it was the duty of the jury to give them just weight in settling the questions of fact involved in the cause, but they were by no means conclusive of the fact alleged

to have been admitted by them. [Cafferatta 1. Cafferatta, 23 Mo. 235; Shepard v. Transit Co., 189 Mo. 362, 87 S. W. 1007.] Besides, none of the statements designated the point at which he first saw the train or its headlight, or amounted to an absolute admission that at that time he was in a place of safety. An inference to the latter effect might possibly be gleaned from them to be measured against his positive testimony to the contrary at the trial, but such inference and comparison were matters for the jury and were properly submitted to them. We are also satisfied, without feeling the need of restating all the evidence and argumentatively tracing the steps leading to our conclusion, that not only is there no conclusive showing that the obstruction ceased in time to let plaintiff see and keep off the track, but there was a sufficient showing to justify an affirmative finding that the headlight did not come into view until the plaintiff's horses were on the track, at which time the train was so near that plaintiff did not have time even to reach his buggy whip, to say nothing of getting off the track. The plaintiff and his daughter so testified, and the evidence of Maxey and his daughter tended to corroborate them in this respect. Plaintiff's story was also supported by the testimony of Lute Diggs and Dr. Divan. Defendant's counsel urges that though one could not see through the grass and weeds in the daytime, it did not follow that he could not see through them at night; that the headlight would shine through the weeds at night. It undoubtedly would if the weeds and grass were not too thick to exclude it, but that was a fact for defendant to prove to the jury. It is clear that it is not conclusively established. One witness, whose credibility was, of course, for the jury, testified on behalf of the defendant that one night he saw a headlight shining through the weeds and grass, but the testimony of plaintiff and his daughter tends to prove that they did not see any headlight through the

grass and weeds, and the Maxeys, defendant's witnesses, though testifying on this subject, did not say that they could so see it. Indeed, their testimony tends to prove the contrary. It is true they say they saw the light of the train reflected in the sky. Whether they testified truly was for the jury. We think the evidence of plaintiff and his daughter and of Erret Oliver tends to prove the contrary. But if Maxeys did see a reflection, a "blush" of light in the *sky* as they say, it does not necessarily follow that plaintiff saw it or was guilty of negligence, as matter of law, in not looking for it there.

Defendant also contends, however, in effect, that the noise and rumble of the train was sufficient to warn the plaintiff not to go on the track and that the failure to heed such warning was contributory negligence as matter of law. There was testimony, though by no means conclusive, from which it might be inferred that the train made a noise, other than giving the statutory signals; indeed it may be, as defendant suggests, that courts will take judicial notice that trains make a noise in running, and the jury might possibly have inferred that in the circumstances plaintiff was placed, he was guilty of contributory negligence in not hearing and heeding such noise. If, however, the court will take judicial notice that the train makes a noise, and on that mere fact, assumed without proof, convict plaintiff of contributory negligence or compel him to affirmatively exculpate himself, what becomes of the rule in these crossing cases that proof of failure to give the statutory signals and of the accident makes a prima facie case and shifts the burden of proving nonliability to the defendant? [Weigman v. Railroad, supra; McNulty v. Railroad, 203 Mo. 475, 101 S. W. 1082.] It is clear that it would be annihilated. As it was laid down by statute, as construed and upheld by our Supreme Court, it is not for us to destroy, but to uphold and follow it. It follows, then, that it must

appear, not only that the train made a noise (whether by proof or judicial notice is immaterial), but that the circumstances were not such as to prevent plaintiff from hearing it or to excuse his not heeding it, and the burden of proving such circumstances was on the defendant and the question was for the jury. There was no such conclusive showing here as would justify us in disturbing the finding of the jury in this respect; indeed, we are impressed that defendant was not relying at the trial on the defense of "other noises," or, if so, but lightly.

Defendant urges, however, that "to move to a crossing at a rapid rate of speed where the view was obscured is negligence, and ordinary care requires that when one cannot see, he should stop to make more careful observation." In the first place, plaintiff did not approach "rapidly," but at a slow trot. Whether he knew that his view was being obstructed or thought he was looking into mere darkness, is a serious question, as to which the testimony does not enlighten us. This we know, that he was not familiar with his surroundings; and defendant's witness Maxey testified that it was "very dark," "awful dark." We cannot presume under these circumstances that he saw or knew of the obstruction, or should have seen or known of it. The question whether he was negligent in that respect was for the jury and not for the court to decide under the circumstances.

It follows also, therefore, that the court properly refused to give defendant's instruction No. 4, which declared it to be the duty of plaintiff to *stop* and look and listen if the embankment and vegetation would prevent his seeing the approaching train, without regard to whether he saw or knew of the obstruction or should have seen or known of it.

We may mention here that defendant urges that the evidence showed that plaintiff had made himself careless by "the use of whiskey." It appears from the

evidence that plaintiff had a bottle of whiskey in his pocket which was within two ounces of being full. The brakeman, witness for defendant, testified that when he went to where the plaintiff lay he picked up a coat, found a bottle of whiskey and "smelled the odor of whiskey there," but did not "know whether on his clothes or on his breath." Another witness for defendant testified that he saw plaintiff take a drink out of the bottle *after* the collision and that plaintiff "smelled like whiskey." That plaintiff said to him, "They may say I am drunk" but "here's all I have drank out of the bottle," holding it up and asking the bystanders if they would have some. The livery man who testified for defendant said on cross-examination that when plaintiff called to get his team that night just before the collision, he seemed to be perfectly sober. It is sufficient to say that this is not by any means a conclusive showing that plaintiff had been made careless by drinking before the collision.

II. It is also urged, however, that the demurrer to the evidence should have been sustained for the alleged reason that there was no evidence in the case that plaintiff's deceased daughter was single and unmarried and that she left no husband or minor child or children surviving her. If such facts were not conceded at the trial, it was necessary for plaintiff to establish them, and no presumption that the deceased had never been married is to be indulged *merely* because she was of tender years, she being over the age when she might lawfully contract marriage, viz.: twelve years. [Marshall v. Consolidated Jack Mines Co., 129 Mo. App. 649, 108 S. W. 573.] The marriage of a child of twelve and one-half years of age is so improbable, however, so contrary to common experience in this State, that slight evidence would be sufficient to establish the contrary; and such evidence need not be direct and positive, but may be shown by facts

and circumstances. Moreover, if the fact that the child had never been married was conceded at the trial, though but tacitly, defendant will not be permitted to complain here that it was not proven. Now, in the case at bar we have not only the tender age of the decedent to consider, but it was proven that she lived with her father, and the record abounds with references to her as Eunice *Dudley* (her father's name), "the little girl," "this little Dudley girl," "the child," "this Dudley child." These terms of reference were not employed alone by the plaintiff's counsel and witnesses, but were resorted to by the defendant's counsel and witnesses, as well. The answer which defendant filed referred to her as "Eunice *Dudley*," and defendant's counsel referred to her as "this Dudley child." One of the instructions given on behalf of the defendant referred to her as plaintiff's daughter, "Eunice Dudley." On the other hand the witnesses and counsel uniformly address and speak of married women in the case by their proper title of "Mrs." Thus it is shown that the decedent was of such tender years it is improbable she was married; that she lived with her father and bore his name, and was referred to by counsel and witnesses in terms usually applied to a little child, and totally inconsistent with the idea that she was a married woman. We consider that it was both proven and conceded on the trial that she had never been married.

III. It is conceded that the court erred "in allowing the witness, Pritchett, to state that he thought a person would have to get within five feet of the south rail to see up the track." Pritchett, who was the postmaster at Martinsburg, having resided there fifteen years, living north of the crossing, and often passing over it, testified that the embankment right at the crossing was four or five feet higher than the railroad track, and about four feet higher than the wagon road; that

the plank wing fence, four feet high, ran south from the cattle guard about twenty feet and up on top of the embankment; that as one traveled along the wagon road, he got on lower ground as he went towards the track, there being a decline of probably a foot there; that the embankment was about twenty feet from where one would be in the wagon road. Plaintiff's counsel asked him whether he had "observed in passing over the crossing about how close you would be to the south rail before you could see up?" Defendant's counsel objected on the ground that it called for a mere opinion or conclusion of the witness. The court ruled that he might answer the question if it was from "actual investigation." Defendant excepted. Witness then answered: "A man would have to be within five feet of the crossing, of the south rail of the crossing, on account of the growth growing on the right of way and on the side of the right of way, grass; there's quite an amount of grass;" saying that he meant the slant of the embankment to the rail; that "there's quite a lot of tufts of grass growing over the sides of the embankments." The question so objected to and exception saved did not call for a "conclusion" as the objection assumed, but for a fact, viz.: whether plaintiff "observed." The responsive answer to this would have been a plain "yes" or "no," and as the answer made was neither, it was not responsive to the question; but defendant did not move to strike out the answer on that ground, hence cannot now complain of its unresponsiveness. However, we are satisfied that the question would have been proper even if it called for the answer which was given. The office of this answer was to show how nearly the obstructing embankment, fence and vegetation extended along the side of the right of way of the road up to the railroad track, and was not a mere conclusion or opinion of the kind the law condemns. [Kansas City, etc., R. R. Co. v. Weeks, 135 Ala. 614, 619; East Tenn., etc., R. R. Co. v. Watson, 90 Ala. 41 45;

Chicago, etc., Ry. Co. v. Chambers, 68 Fed. 148, 154; Chicago City Ry. Co. v. Rohe, 118 Ill. App. 322, 324; Hoffman v. The Met. St. Ry. Co., 51 Mo. App. 273, 276; Parker v. Street Ry. Co., 69 Mo. App. 54, 61.] The objection was properly overruled.

On cross-examination defendant's counsel elicited from the witness that "if the grass was growing there" one "would have to get up within five foot of the rail to see a train probably 300 feet;" that he never looked particularly to see a train; that he does not know how high a train is, "supposed to be ten or twelve feet." "Q. If you never looked to see a train, how do you know you couldn't see one? A. Simply because I would think a man would have to be that close to it to see up the track. Q. You mean to see along the track, the rail along the track? A. I mean to see up the track, yes, sir; if you can see the rail, you can see above it." Mr. Robertson: "Now I move to strike out all this witness's testimony on the ground it's simply shown to be his conclusions and not based on any facts." The motion was overruled and exception saved. Proceeding further the defendant's counsel elicited from the witness that he did not know how high a box car or headlight is; that an engine and smokestack is probably higher than a car; that if a headlight was twelve feet high, a man standing back fifty feet from the crossing might see it; that he does not get on higher, but on lower, ground as he goes toward the track, because the ground is worn out there, there is a little, probably a foot, decline, going toward the track; the embankment is at least five feet above the railroad and has a rail or plank fence on it four feet high, which would make about nine feet, and one sitting in a buggy would be within twenty feet of such obstruction; that the fence was not solid and the light would shine through its cracks if there was nothing to prevent, in the way of grass; that the eye of a man six feet tall standing down in the road would not be

above the fence; that the top of the ground on the embankment is at least four feet higher than the road, back twenty-five feet. "Q. Now I will get you to state if you didn't answer this question this way in the other trial; if Mr. Grant didn't ask you this question, 'Did you ever notice that embankment when there was vegetation growing on it?' 'I do not know anything about the vegetation, no, sir?' A. That's exactly the question he asked me in regard to the vegetation and I told him I didn't know anything about it; didn't know whether it was burned off or cut off; that's exactly the answer I made him. Q. Well now, you say the vegetation would keep you from looking? A. I didn't say it kept me from looking; I said in case vegetation was growing there you couldn't see. Mr. Roberston: Then I ask the witness's testimony be stricken out as not based on any fact or any observation. Mr. Gantt: I object to that for the reason the ground is exactly the same. Q. (By Mr. Gantt) That ground there, the lay of the ground of that cut and around the crossing, I will get you to state if it's exactly the same now, or was the same when you observed it, as at the time of the accident; that is the ground itself? A. Yes, sir, I know the ground is just the same as it was but I couldn't tell you about the grass; I never observed it. The Court: The motion to strike out will be overruled. To which ruling of the court defendant then and there excepted and saved its exceptions. Mr. David H. Robertson: And I want to move to strike out his testimony for this reason: He testified he had to get in five feet of the track to see an engine, and then goes on to testify he never made any such experiment, and goes on further to testify he don't know how high the engine is, or box car is, and manifestly he has no facts although the court allows him to draw a conclusion; the conclusion itself shows it's based on no facts at all; to allow the witness to get up and state he couldn't see

a train, and don't know how high a car is and never tried to make any such experiment at all; I think it's a conclusion of the witness that shows it's not based on any facts at all. The Court: The motion to strike out will be overruled. To which ruling of the court defendant then and there excepted and saved its exceptions."

Now if the admissions which the witness made in his cross-examination had the effect of rendering part of his testimony incompetent, a proper motion should have been made, specifically pointing out the objectionable part and asking that it be stricken out. No such motion was made, but each motion was so broad and indefinite that to have sustained it as made would have had the effect of striking out all of the witness's testimony. The motions that were made were properly overruled because, even though some of the witness's testimony was incompetent, all of it was not. [See Ferguson v. Davidson, 147 Mo. 664, 672, 49 S. W. 859.]

IV. The point is made that the trial court erred in admitting in evidence a bundle of weeds and grass because "they were shown not to be in the condition that they were when standing upon the ground." It is not questioned but that they were properly identified as being part of the same weeds and grass which obstructed the plaintiff's view, but it is urged that because it appeared that the weeds and grass had dried and were tied in bundles, they gave a false impression as to their condition while standing on the ground. The weeds and grass being sufficiently identified were properly admitted in evidence. [Connor v. Wabash Ry. Co., 149 Mo. App. 675, 129 S. W. 777.] Nor do we think that the circumstance that they had dried and were tied into bundles when shown to the jury was sufficient to render them inadmissible in evidence. The difference between their appearance when green and growing and the time when they were shown to

the jury was carefully explained to the jury by testimony, and was a proper fact for the jury to consider in determining the weight that should be given to their appearance and the testimony of the witnesses in regard to them; but we are of the opinion that it did not destroy their probative value. [State v. Brannan, 206 Mo. 636, 105 S. W. 602.]

V. Defendant complains of the instruction on the measure of damages as follows:

"If under the evidence and the other instructions given in this case you decide to find a verdict for the plaintiff, then you may return a verdict in a sum not less than two thousand dollars and not exceeding ten thousand dollars."

The instruction is criticised because "although it confines the jury to the statutory limits, it does not tell them to exercise their *discretion* in arriving at the amount of their verdict between the limits." But the instruction was right in its general scope. The verdict, if for the plaintiff, may be for an amount within the limits mentioned. That is all the instruction said. To that extent it was correct. It failed to direct the jury how they should arrive at such amount, viz.: in the exercise of a sound discretion, giving consideration to the extent of the injury so as to give effect to the remedial side of the statute and to the facts of the negligence so as to give effect to the penal side of the statute. [Boyd v. Railroad, 236 Mo. 54, 93, 139 S. W. 561.] But such failure amounted to nothing more than mere nondirection for which the trial court cannot be convicted of error, the defendant having offered nothing to supply the omissions. [Browning v. Railroad, 124 Mo. 55, 27 S. W. 644; Smith v. Fordyce, 190 Mo. 1, 88 S. W. 679.]

The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.