EMILIO RIVERA MALDONADO, Plaintiff and Appellant, *v.* CENTRAL PASTO VIEJO, INC. Defendant and Appellee.

No. 5651. Decided December 16, 1932.

*F. Gallardo Díaz* for appellant. *Walter L. Newsom, Jr., J. Henri Brown,* and *R. Castro Fernández* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

The defendant, by one of its attorneys, has moved for the reconsideration of the judgment of this Court (43 P.R.R. ——),* reversing that of the District Court of Humacao. The arguments on which defendant-appellee bases its motion for reconsideration are as follows:

"1. If the Court considered that the trial judge did not decide the conflict of evidence on the issues of the case, and did not comply with the duty of finding the facts on which his judgment was based, as required by law, then the case was not ready for review of the judgment on appeal, and it should have been remanded to the lower court in order that the trial judge might comply with the requirements of the law.

---

* NOTE: See Preface of this volume.

"2. If the judgment of this Court is based on the proposition that the plaintiff's failure to stop, look, and listen was not negligence constituting the proximate cause of the accident, the judgment is contrary to law.

"3. If the Supreme Court bases its judgment on the ground that the evidence does not support the conclusion of the trial court that the plaintiff did not stop, look, or listen, such a basis would be contrary to the facts, supplemented by judicial notice, and would not allow due weight to the view or inspection made by the trial judge."

Let us first examine the conclusions and reasoning on which the judgment reversed by us is based. The court *a quo*, after expressing great doubts that the plaintiff, if in fact he stopped his automobile, looked and tried to listen, should not have heard the train which was approaching and which was so close to him, even supposing that the locomotive had given no warning with its whistle and bell, makes use of the following syllogism to formulate its conclusions:

"If we accept the theory of defendant that its employees blew the whistle and rang the bell when approaching the crossing, it is clear that the plaintiff was negligent in attempting to cross the track when he had noticed that the train was approaching; if on the contrary we should assume that the plaintiff stopped his car, looked, and listened, it seems to us inexplicable that, in the silence of night, and in view of the position of the track in relation with the road, and the proximity of the train, he and his companion should not have noticed, from the noise of the engine, that the train was near and that it was not prudent for them to attempt to cross the tracks at that moment, inasmuch as a careful person, as required by the law and the jurisprudence, would have awaited and ascertained, definitely and positively, that the train was about to pass the crossing which he was also trying to use at the time."

The foregoing reasoning leads to the unavoidable conclusion that the plaintiff was guilty of contributory negligence. According to the opinion of the lower court, if the defendant's employees blew the whistle and rang the bell, the plaintiff was negligent in attempting to cross the track; if on the contrary it is assumed that the plaintiff stopped his car, looked, and listened, then it is inexplicable to the lower court that

the said plaintiff should not have noticed, from the noise of the engine, that the train was near and that it was not prudent to attempt to cross the track at the moment. Following this theory, it is very difficult for the victim of a railroad accident occuring at night at a crossing on a public road to escape the charge that he was negligent, for if the whistle and bell were sounded he should have heard, and if they were not sounded he should also have heard the rumble of the approaching locomotive. The syllogism of the lower court is very similar to another syllogism which we have found in *Mayes* v. *Southern Ry. Co.*, 26 S.E. 148, 149, decided by the Supreme Court of North Carolina. From the opinion of the court in that case we copy the following:

"The exception to the charge, and the first three exceptions for refusal to charge, present substantially the same proposition,—that though the plaintiff looked and listened, and did not see nor hear the approaching train, yet, if he might have done so, it is contributory negligence. If by this it was proposed to ask the court to charge that the plaintiff was not excused if he looked and listened carelessly and negligently, this should have been pointedly and plainly asked. Besides, it was covered substantially by the charge given, that 'it was the duty of the plaintiff to use ordinary and reasonable care to avoid accident, and to exercise his senses of hearing and sight, to keep a lookout for approaching trains, and if he did not, and drove inattentively on the track, without keeping a lookout or listening for approaching trains, it is contributory negligence.' This charge, repeated three times in different phases, was really erroneous towards the plaintiff (the appellee), in that it makes him guilty of contributory negligence for not looking and listening in all cases, even if no light was on the front end of the moving train (at night), and no bell rung. Yet, if such was the case (and the plaintiff both alleged it was and offered proof of it), the failure of the plaintiff to look and listen at a crossing was not contributory negligence.

"But we do not understand the defendant to complain that the jury was not instructed that the looking and listening must be done with proper care, but his proposition is that if the plaintiff looked and listened, and might have seen or heard, and did not see or hear, as a proposition of law he did not look and listen. That, however, is a matter of fact, and not a proposition of law. By 'looking and

240

listening' the jury must have understood, under the terms of the charge, 'looking and listening with proper attention.' The syllogism of the defendant is something like this: 'Though 3 plus 4 are 7, yet, if they make 8, they are not 3 plus 4.' True enough, but the question of fact is whether there was '3 plus 4,' and that determines whether the sum is 7 or not. The defendant is travelling in a circle. If the plaintiff looked and listened with care, he saw or heard the approaching train if he could have done so; and if he did not see and hear it, when he might have done so, then he did not, with proper attention, look and listen.''

The question raised by the defendant in the North Carolina case is very much the same as the syllogism of which the District Court of Humacao makes use to formulate its conclusions. Although the opinion does not say so, it is to be assumed that in the North Carolina case the defendant requested his instructions on the basis of the evidence. In the instant case the court speaks of the silence of the night, the position of the track, and the noise of the engine in stating its conclusions. As to the silence of the night, the lower court tells us in its opinion that the accident occurred during the early morning hours, when there is a complete and absolute silence, and much more so in the country, where there is no traffic. How could the lower court have arrived at the conclusion that there was a complete and absolute silence on the night of the accident? No evidence whatever was presented as to the weather conditions that night. There is a total absence of evidence as to the stillness and silence prevailing at the time, we do not know whether there was a breeze or absolute stillness, or the direction of the wind. We can not understand how categorical assertions may be made with respect to the silence prevailing at the time of the accident, without a scintilla of evidence as to the atmospheric conditions that night, particularly in a tropical region such as ours where it is a matter of common knowledge that a breeze frequently blows during the night. The absence of such evidence does not authorize the presumption of complete and absolute silence. Nor may the court take judicial notice

of atmospheric conditions, which are not stable and may vary, as they frequently do.

In *City of Santa Cruz* v. *Enright*, 30 Pac. 197, the Supreme Court of California says:

"We cannot say that the court erred in excluding the testimony of the witness Ray, called on behalf of the defendant. He was requested to give his opinion as an expert as to the effect of irrigation upon the lands owned by the defendant. Counsel for plaintiff objected to the question, on the ground that the witness was not shown to be competent to testify. It appeared that the experience of the witness had been confined to the county of Santa Clara, and that he had never been upon the tract of land owned by the defendant, except for a period of one day in the winter prior to the time of the trial. To entitle the witness to testify it ought to have been shown that the conditions as to climate, soil, topography, and rainfall were the same in the mountains of Santa Cruz as they were in the southern part of Santa Clara county, where the witness resided. The court cannot take judicial notice of such matters."

In *Haines* v. *Gibson*, 73 N.W. 126, 127, the Supreme Court of Michigan expresses itself in the following terms:

". . . Counsel also appear to assume that it is common knowledge that the lakes and streams in that country are usually frozen over the 1st of April, and to argue from this that the proper interpretation to be given to the contract is that the logs were to be hauled to and banked upon the shore of Pine Lake. The haul to Ives Lake is considerably shorter than the one over Mountain Lake to Pine Lake. The contract prescribed no route for hauling, and manifestly any feasible route was left open for adoption. If the sureties desired to have a route fixed, they should have had it inserted in the contract. Counsel for defendants offered to show that Gibson & Gamble informed their sureties that the haul would be over Mountain Lake, but plaintiffs were not present, and no offer was made to show that plaintiffs knew or assented to this representation. The contract fairly assumes a possibility that the water might be open, so as to move the logs by the 1st of April. We cannot take judicial notice that the condition of the weather in that part of the state is always such that the water is never open by that time, and from that to interpret this contract as meaning that the logs were to be hauled to and put upon the ice on Pine Lake. We think the court committed

no error in rejecting testimony tending to show that the logs were hauled to Ives Lake by the assent of the plaintiffs.''

In *Dixon* v. *Nicholls*, 89 Am. Dec. 312, 317, the Supreme Court of Illinois states that courts take judicial notice of facts of unvarying occurrence, but not of the vicissitudes of climate or of the seasons. From the opinion of the court in that case we copy the following:

''. . . He argues that as by the agreement Brodrick was to deliver the small grain in the half-bushel as soon as thrashed, and as there was no time specified when it should be thrashed, the law would hold that it should be thrashed and delivered in a reasonable time; and he further insists that the court will judicially take notice of the time when such crops matured, on the principle that whatever ought to be generally known within the limits of its jurisdiction, of that the court will judicially take notice. We do not think the doctrine of judicial notice has been carried quite to the extent claimed by the plaintiff in error. It cannot be so extended, because the time for those crops of wheat, oats, and barley to mature varies greatly in the different judicial divisions of this state. In the county where this cause was tried, and that in which this opinion is written, the time at which these crops mature is very different. Even in the same locality there is a difference. Of facts of unvarying occurrence courts must take judicial notice, but not of the vicissitudes of climate or of the seasons. These, like other facts, if relied on as important, must be proved by the party seeking an advantage therefrom.''

The wind may make it difficult to hear the noise of an approaching locomotive. In *Continental Improvement Co.* v. *Stead*, 95 U.S. 161, 164, the Supreme Court of the United States said:

''. . . The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing.''

In the absence of evidence, the court is not authorized to assume a complete and absolute silence during the night. The trier of fact must limit himself to the evidence taken, without entering the field of mental conjecture and speculation. In the absence of evidence, it is no more reasonable to assume, as the lower court did, that there was complete and absolute silence, than to assume that there was not. The lower court speaks of the noise made by a locomotive pulling thirty freight cars loaded with cane, and takes this fact into account when concluding that it is inexplicable that the plaintiff should not have noticed, at nighttime, that the train was approaching. The reasoning of the lower court does not convince us. Both at common law and under the statutes of the several states it is required, at least, that reasonable warning of the approach of the train be given to persons who may cross the track on a public road or street. The law does not require useless things. If the noise of a locomotive were a sufficient warning, these statutes would not exist, nor would these principles be applied by courts of justice. The statutes of the several States generally require the sounding of a whistle or bell, or both. The law of Puerto Rico imposes on railroad companies the duty of installing on their locomotives bells or whistles which should be used when approaching curves, tunnels, and crossings at public roads or streets. The number of cars that a locomotive may pull has not been taken into account in fixing these requirements either in Puerto Rico or in any of the States of the Union.

The defendant in its brief tells us that the trial judge had judicial notice that a thirty-car train makes noise, that a locomotive pulling freight cars produces explosions when emitting smoke, that such explosions are stronger when the load is heavy, that sparks issue from the smokestack, and that there are more sparks when the locomotive is climbing a grade, or is heavily loaded, and that in the darkness of night a luminosity may be noted in the smoke issuing from the smokestack. In support of his contention, counsel for the

defendant cites the cases of *Cleveland, etc., R. Co.* v. *Nichols,* 99 N.E. 497; *Louisville, etc., R. Co.* v. *Commonwealth,* 166 S.W. 237; *Moore* v. *Saginaw R. Co.,* 72 N.W. 1112; *Louisville, etc., R. Co.* v. *Davis,* 75 So. 977; and *White* v. *N. Y. Cent R. Co.,* 85 N.Y. Supp. 497.

That a locomotive makes noise, and that it must make noise when pulling thirty freight cars, is clearly a matter of judicial notice. The question is whether such noise is a reasonable warning to persons crossing the track on a public road or street. We do not deny the possibility of exceptional cases where the noise of the train is extraordinary and where other circumstances may intervene which may be considered in order to determine whether or not there was contributory negligence; but in such cases, for the very reason that they are unusual, evidence should be presented from which to draw inferences and deductions, which should not be based on mere conjeture, or on the knowledge possessed by the court that a train makes noise.

In *Dudley* v. *Wabash R. Co.,* 150 S.W. 737, 741, 742, the Missouri Court of Appeals said:

"Defendant also contends, however, in effect, that the noise and rumble of the train was sufficient to warn the plaintiff not to go on the track, and that the failure to heed such warning was contributory negligence as matter of law. There was testimony, though by no means conclusive, from which it might be inferred that the train made a noise, other than giving the statutory signals; indeed, it may be, as defendant suggests, that courts will take judicial notice that trains make a noise in running, and the jury might possibly have inferred that in the circumstances plaintiff was placed he was guilty of contributory negligence in not hearing and heeding such noise. If, however, the court will take judicial notice that the train makes a noise, and on that mere fact, assumed without proof, convict plaintiff of contributory negligence, or compel him to affirmatively exculpate himself, what becomes of the rule in these crossing cases that proof of failure to give the statutory signals and of the accident makes a prima facie case, and shifts the burden of proving nonliability to the defendant? *Weigman* v. *Railroad,* 203 Mo. 475, 101 S. W. 1082. It is clear that it would be annihilated. As it was

laid down by statute, as construed and upheld by our Supreme Court, it is not for us to destroy, but to uphold and follow it. It follows, then, that it must appear, not only that the train made a noise (whether by proof or judicial notice is immaterial), but that the circumstances were not such as to prevent plaintiff from hearing it, or to excuse his not heeding it, and the burden of proving such circumstances was on the defendant, and the question was for the jury. There was no such conclusive showing here as would justify us in disturbing the finding of the jury in this respect; indeed, we are impressed that defendant was not relying at the trial on the defense of 'other noises,' or, if so, but lightly.''

On the basis of a fact which is a matter of common knowledge, the lower court, independently from the evidence taken, makes deductions and inferences of a legal nature, which may be considered, accepted, or rejected on appeal. We find no special reason to justify the conclusion that, because of the noise made by the locomotive and the cars it was pulling, the plaintiff necessarily must have been aware that the train was approaching.

In *Cleveland, etc. R. Co.* v. *Nichols, supra,* cited by the appellee, the defendant company maintained that the court had judicial notice of the noise made by a train travelling at sixty miles per hour. Deciding this point, the Indiana Court of Appeals said:

''This court may take judicial knowledge of the fact that an approaching train will make some noise, but on the facts alleged we cannot go to the extend of holding as a matter of law that the warning given by such noise was sufficient to show the decedent guilty of contributory negligence.''

In *Louisville, etc., R. Co.* v. *Commonwealth, supra,* also cited by appellee, a railroad company was accused of maintaining a public nuisance. The grand jury indicted the company, and the motion of the company to quash the indictment was dismissed. The Kentucky Court of Appeals said in that case:

''It is a matter of common knowledge that the emission of smoke from engines, and ringing of bells, the blowing of whistles, and the

grinding of wheels are necessary incidents to the operation of railroad trains. A railroad cannot be operated without burning coal, and the coal cannot be burned without making smoke; the ringing of bells and the blowing of whistles are not only necessary incidents to the operation of railroad trains, but the giving of signals in that way is actually required by law in many instances; and it is perfectly apparent that the grinding of wheels cannot be avoided in the operation of trains.''

In *Moore* v. *Saginaw R. Co., supra,* also among the cases cited by appellee, the Supreme Court of Michigan only says that ''The, court will take judicial notice of the fact that it is difficult, it not impossible, to handle freight trains of varying length upon roads of varying grade without concussions.''

In *Louisville, etc., R. Co.* v. *Davis, supra,* also cited by appellee, there was involved a fire caused by sparks from an engine which destroyed plaintiff's house. Referring to the sparks emitted by the engine, the Supreme Court of Alabama said:

''One of plaintiff's witnesses testified that the sparks here emitted were unusual in size and quantity; and another testified that they were in quantities larger than he had observed from other engines running at night. 'Unusual' is a word of comparison. Comparisons are obviously wanting in probative value unless relative conditions are substantially the same. The evidence here shows, and this is but common knowledge, that the quantity of sparks emitted by an engine will depend upon the force and rapidity of the exhaust, and this in turn is dependent upon the load to be pulled, as well as upon the grade and curve of the track. Manifestly the quantity and size of sparks emitted by a heavily loaded engine pulling up a grade would be unusual with respect to an engine pulling a lighter load on a level track, or on a down grade; but it might not be unusual with respect to any engine operated under equally unfavorable conditions.''

The smoke and sparks emitted by an engine have nothing to do with the noise it makes. We suppose that the defendant cites these authorities for the purpose of showing that the smoke and sparks are elements to be considered with respect to the visibility of an approaching train.

The defendant also cites the case of *White* v. *N. Y. Cent. R. Co., supra,* which we have not been able to study because it is not in our library.

As to the position of the track, the court in its opinion tells us that it runs almost parallel to the road for some meters before crossing the road, and counsel for the plaintiff in his brief, and later at the hearing of the case, called our attention to this statement, which according to him is not accurate and is not justified by the evidence. The lower court made a view or inspection, the result of which is described at page 35 of the statement of the case as follows:

"In making the inspection it was noted that the track crosses the road from Humacao to the beach at the place known as Central Pasto Viejo grade crossing; that the track crosses there from north to south; that to the south there is a small curve and to the north there is a small grade; that to the west there are a number of houses some six or seven hundred meters from the road and the crossing; that there is a culvert six meters, more or less, to the east."

The defendant lays stress on this view or inspection and states that in Puerto Rico there is no legislation with respect to views or inspections, and since the Law of Evidence has American sources, American cases are applicable.

Without admitting the soundness of the contention of the learned counsel for the defendant, we feel that when a judge makes an inspection and records its result, and later approves and signs the statement of the case containing a description of the place inspected, the judge should omit no essential fact, and should not use as a basis for his decision any fact which has not been included in that description.

Section 1194 of our Civil Code, 1930 edition, equivalent to section 1240 of the Spanish Civil Code, states that the evidence of the personal inspection by the court or judge shall be effective only insofar as it may permit the court to ascertain, from the external appearance of the thing inspected, the fact in issue. The precedents for this legislation are found in the laws of *Partidas,* particularly the eighth and thirteenth laws

of title 14 of the third *Partida*. This evidence is known as judicial examination in the Spanish Law of Civil procedure, and as personal inspection by the judge in the Civil Code.

As to the form of carrying out the inspection, we feel we should be governed by the former Law of Civil Procedure according to which, once the judicial examination is ordered, the judge shall fix, at least three days in advance, the day and hour on which it is to be made, the parties and their attorneys being entitled to be present at the examination and to make to the judge such verbal observations as they may deem proper, each party being also allowed to take with him a person familiar with the place, whom the judge will hear, if he deems it advisable, under oath, and it being further provided that a record of the result of the inspection shall be made and signed by those present, containing the pertinent observations made by each party, and the testimony of the experts.

We have said that, as to the form of the inspection, the former Law of Civil Procedure governs, for neither General Order No. 118, which does not mention views or inspections, nor the Code of Civil Procedure in force, which also is silent on the matter, have repealed the provisions with respect to this type of evidence which were in force when these more recent procedural laws were approved. The Code of Civil Procedure repealed all laws, royal decrees, orders, military orders, acts, or parts of acts, inconsistent or in conflict with the said code. The former Law of Civil Procedure, with respect to judicial examination, can not conflict in any way with the Code of Civil Procedure in force, which makes absolutely no mention of this class of evidence.

We do not know whether in this case a record was made and signed by those present, but we do know that the result of the view or inspection was noted, that the statement of the case contains a description of the place, and that the statement of the case was approved by the court with the consent of the parties.

The lower court states that the evidence shows that the plaintiff was perfectly familiar with the road, and also knew that there were no barriers, chains, etc., at that place for the protection of passers-by. We have carefully examined all the evidence taken at the trial and there is nothing in it to justify such a positive assertion. The plaintiff said that he knew Pedro Vasallo, whom he had taken to Naguabo several times. This is the only evidence, for there is no other on record, which the court could have considered in making its findings and in holding that the plaintiff was perfectly familiar with all these details. We copy below the categorical assertions of the court, undoubtedly suggested by the testimony of the plaintiff:

"Moreover, the evidence also shows that the chauffeur driving the car in question was perfectly familiar with the road from Humacao to the beach, and knew besides that there were no barriers or chains at that place for the protection of passers-by, as also that there was no person or gatekeeper entrusted with warning travelers of the proximity of the train."

The defendant's evidence shows that there was no one there at night to signal, but that there was someone in the time day. On what does the lower court base its assertion that the plaintiff knew that there was no person or gatekeepers at the crossing charged with warning travelers of the proximity of the train? Where is the evidence to justify this conclusion? Assuming that the plaintiff, when taking Pedro Vasallo on previous occasions to Naguabo, used this road and knew that there were no barriers or chains at the crossing, there was no showing that he had passed the place at night, and if he had done so during the day and had seen there a person charged with giving warning, he was not bound to presume that this person would not be there at night. It seems to us that this was a manifest error on the part of the lower court in weighing the evidence.

It is true that Pedro Vasallo testified that he knew the crossing, but it was not shown that he transmitted this knowl-

edge to the plaintiff, and in the absence of evidence the knowledge of the crossing possessed by his companion can not be imputed to the plaintiff.

The defendant contends that if this Court considered that the trial judge had failed to make findings on facts which were necessary to support the judgment appealed from, the judgment should have been reversed and a new trial ordered. The defendant further contends that the trial judge found that the plaintiff did not stop or listen before crossing the track, and that if he had stopped and listened he would have noticed that the train was approaching.

The lower court did not say that it gave no credit to the testimony of the plaintiff or his witness Pedro Vasallo because of the manner in which they testified or for any other reason which might cast doubt on the veracity of the said witnesses. The court *a quo* considers the plaintiff negligent if the whistle and bell were sounded, and then, taking into account exclusively the complete and absolute silence of the night, the position of the track, and the noise of the engine, finds it inexplicable that the plaintiff should not have noticed that the train was approaching. This Court is not bound to accept the inferences and deductions made by lower courts in analyzing the evidence, nor is it bound to accept facts which do not appear from the evidence and of which judicial notice may not be taken.

If the testimony that the plaintiff stopped, looked, and listened, and neither saw nor heard, is not physically incredible, we feel that this testimony must be weighed and considered in accordance with the rules of evidence. We must not forget that there is no conflict of evidence on the point, that the statements involved have not been contradicted, and that the lower court, if indeed it did not believe these witnesseses, based its disbelief on the ground that it was inexplicable that the plaintiff should not have noticed that the train was approaching.

Without taking into account the testimony of the plaintiff, due to his natural interest in his own case, let us rely on the uncontradicted testimony of Pedro Vasallo, who testified that, shortly before arriving at the crossing, the plaintiff stopped the "Ford," looked both ways on the track, and saw no locomotive approaching.

In the case of *In re Miller's Will*, 49 Ore. 452, 462; 90 Pac. 1002, the Supreme Court of Oregon says:

"It is firmly established everywhere that, as a general rule, when a disinterested witness, who is in no way discredited by other evidence, testifies to a fact within the knowledge of such witness, which is not in itself improbable, or in conflict with other evidence, the witness is to be believed, and the facts so given are to be taken as legally established."

The general rule is that the positive testimony of a disinterested witness, who has not been impeached or contradicted, may not be arbitrarily or capriciously discarded.

Let us see whether the testimony of Pedro Vasallo that the plaintiff looked both ways on the track and saw no locomotive is incredible or improbable. The defendant's engineer, Rafael García, tells us that the engine's searchlights had been lost, and at the time of the accident it had two gas lanterns, two small gas lanterns. It is not necessary to cite cases to show that such lights are not sufficient to make a train visible at a reasonable distance. The lower court states in its opinion that the place between the road and the track was planted with sugar cane, but that it was impossible to determine the height of the cane on the night of the accident. It is true that the height of the cane was not determined, as the lower court states; but the witness Pedro Vasallo testified, and his testimony was not contradicted, that at that time there was cane on both sides of the track, and that one could not see. If it is borne in mind that the locomotive carried only two small gas lanterns, as appears from the defendant's own evidence, and that there was cane on both sides of the track obstructing the vision, the testimony of the

witness that although plaintiff looked he did not see any loco-motive does not seem unreasonable.

With respect to the lights which should be carried by a train, Thompson, in his Commentaries on the Law of Negli-gence, paragraph 1548, page 224, says:

"Failure to have Proper Headlights on Locomotive and Train.—The duty which the law imposes upon a traveller approaching a railway crossing, to look for approaching trains, would be rendered nugatory if such trains carried no lights by which their approach could be discerned in the night-time. It is, therefore, well said to be the reciprocal duty of those approaching a railway crossing, in the night-time, to look for approaching trains, and of the railroad company to have a *headlight* upon its engines, so that the act of looking on the part of the traveller may be effectual to give him the requisite warning. It has been justly characterized as negligence, as matter of law, for a railway company to run a passenger train on a dark night, in a populous country, approaching a crossing near the suburbs of a city, at the rate of twenty-five miles an hour, with-out having the lantern at the head of the locomotive lighted. Munic-ipal ordinances have frequently been enacted enforcing the duty to display lights upon moving trains at night, the violation of which will be negligence *per se*, or *prima facie evidence of negligence*, ac-cording to the theory prevailing in the particular jurisdiction. If, in addition to having no headlight, the train approaches the crossing at a dangerous rate of speed without giving any alarm, the negli-gence of the railroad company is, under the theory of one court, so *gross* as to make the company liable, notwithstanding the contribu-tory negligence of the driver in failing to *stop, look,* and *listen*. For a railway company to back a train which is several hours late, on a dark night, through a shed used as a depot, across a passway much used by the public with the knowledge and consent of the company, without any light, flagman, or signalman on the front of the fore-most car, has been justly held to be evidence of negligence, in case the train thus propelled runs upon a person on the passway. In nearly all cases which speak upon this element of negligence, the absence of lights on the locomotive or cars at night is associated with some other dereliction, such as running an engine or cars at an ex-cessive or prohibited rate of speed and without any audible signal to warn the traveller in time to enable him to get out of the way."

The defendant cites four cases in support of its contention that the lower court held that the plaintiff neither stopped nor listened, and that the failure to take these precautions caused the accident.

Of these cases, that which applies the doctrine of contributory negligence most strictly is *Atlantic Coast Line R. Co.* v. *McLeod,* 11 F. (2d) 22, decided by the U. S. Circuit Court of Appeals for the Fourth Circuit. In that case the accident occurred during the night, in the county of Sumter, South Carolina. It was shown that the locomotive was equipped with an electric headlight which was lit and in good condition, and that the train had been heard by one of the witnesses for the plaintiff at a distance of two-hundred and fifty yards. The plaintiff testified that shortly after midnight he and two young men were travelling on the highway and were about to cross the track when they were struck by an approaching freight train, the two young men being killed outright. This was the plaintiff's testimony at the trial. Shortly after the accident the plaintiff told the coroner of Sumter County, and also the physician who attended him, that he and his companions had been drinking on the night of the accident, and that the three of them had gone to sleep on the track; that the train woke him up, and he was about to arise when it struck him. The plaintiff testified that he looked and listened when the train approached. The court, on the basis of the plaintiff's own testimony, comes to the conclusion that he walked directly into the path of the approaching train, when, by exercising the slightest care, he could have seen the danger and avoided the injury. "This," says the court, "is not the case of a traveler in an automobile, whose attention is occupied in part with the driving of his car, and who is unable to stop instantly because of its momentum. It is the case of a pedestrian proceeding leisurely down a highway at night, with nothing to do but look and listen while approaching the crossing, who has it in his power at every moment up to his going upon the track to stop and avoid the danger, and who, nevertheless,

with his eyes open and his brain clear, walks deliberately in front of a freight train of 45 cars, running at a speed of 30 miles an hour, and making so much noise as to be heard 250 yards away.'' The court considered incredible the testimony of the plaintiff that he looked and listened on approaching the crossing. ''If he had looked and listened,'' says the court, ''immediately before going upon the track, he must necessarily have both seen and heard the train, and we conclude that, if he did in fact look and listen when approaching the crossing, he must have done so some distance away, and not immediately before going upon the track, as he should have done.''

The facts which developed in the case decided by the said Circuit Court of Appeals for the Fourth Circuit are different from those of the case at bar. In the first place, the inferences and deductions of the court, which seem to us somewhat severe, are based on the evidence. It was shown that the locomotive was equipped with an electric headlight which was lit and in good condition. In the instant case it was only shown that the locomotive carried two small gas lanterns. It was shown, from plaintiff's own evidence, that the train had been heard 250 yards away. Here there is no evidence whatever to contradict the plaintiff's statement that he did not hear the train. The court itself distinguishes the case of a person walking across the track from that of one driving an automobile over the crossing. And the court itself says, although this seems inexplicable, that the plaintiff, with his eyes open and his head clear, deliberately walked in front of the approaching train. The instinct of self preservation seems to run counter to these conclusions, unless the plaintiff had been drinking, as he said shortly after the accident and was intoxicated, in which case he could not have had a clear head or his eyes normally open, even though he were guilty of contributory negligence. If to this is added the fact that the two young men who accompanied the plaintiff per-

ished in the accident, then we would have to consider that the three persons committed an insane rather than a reckless act, for otherwise it is inconceivable that they should have deliberately, at the risk of their lives, walked in front of the approaching train.

With respect to the natural inclination to protect ourselves against danger, the Supreme Court of the United States says in *Baltimore & Potomac R. R.* v. *Landrigan*, 191 U. S. 461, 474:

". . . The presumption is founded on a law of nature. We know of no more universal instinct than that of self preservation—none that so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming and death. There are few presumptions, based on human feelings or experience, that have surer foundation than that expressed in the instruction objected to. But notwithstanding the incentives to the contrary, men are sometimes inattentive, careless or reckless of danger. These the law does not excuse nor does it distinguishes between the degrees of negligence."

That case dealt with a person who lost his life in a railroad accident, and the Supreme Court made the above statement while considering and approving an instruction to the jury to the effect that, in the absence of evidence to the contrary, it must be presumed that the victim of the accident stopped, looked, and listened.

In the case of *Gordon Fireproof Warehouse and Van Co.* v. *Hines,* 272 Fed. 604, cited by the defendant, it was held that contributory negligence had been established. The case involved a collision between a truck driven by one Kimball and a freight car which, with three others, was being pushed across the street by an engine of the railroad company. Kimball, who was familiar with the crossing, which he passed three or four times a day, testified that about five feet away, to the west of the track, he slowed the speed of the truck down to less than eight miles an hour; that he could not say exactly to what speed he slowed down; and that when he saw

the train coming he tried to cross the track. He further testified that when he slowed down he looked, and did not see or hear cars approaching. The court describes the place of the accident, examines the evidence, and taking into account the circumstances of the case arrives at the conclusion that if Kimball did not look to see the approaching cars he was negligent, and that if he looked he should have seen the cars approaching the street, and if, having seen, as he testified, he tried to cross the track and failed, he was also negligent. It was shown that the truck was travelling at fifteen miles an hour at the time of the accident and that Kimball did not stop to look and listen. The answer alleged that the accident was caused solely by the negligence and carelessness of Kimball.

In *Southern Railway Co.* v. *Smith,* 86 Fed. 292, it was shown by uncontroverted testimony that the approaching train could be seen from two-hundred and fifty yards to a quarter of a mile away form the place of the accident. All of the witnesses, with the exception of the plaintiff, testified that they saw the train coming, and many that they heard the bell ring. The accident occurred in the daytime. The plaintiff testified several times that he looked to see whether the train was approaching. The court thought his testimony incredible. The train was there to be seen, it says, and either the plaintiff did not look, or if he looked he must have seen it.

In *May* v. *Rhode Island Company,* 176 Fed. 383, 384, the court expressed itself as follows:

"A number of desinterested and respectable witnesses testified that when the plaintiff turned to cross the track the car was so near that a collision was inevitable. According to positive testimony the motorman immediately endeavored to stop the car, and his failure to avoid the collision was due, not to the lack of effort or due diligence on his part, but to the nearness of the place at which the plaintiff attempted to cross the track.

"The sole testimony tending to show the slightest degree of care on the part of the plaintiff is from the plaintiff himself, who says that he turned to cross behind a car going west, and that his horse's head was about one foot from the rail when he looked up the track,

in the direction from which the car that struck him was coming, for a considerable distance. His statement that he looked out is directly contradicted by several witnesses, and by the fact that, if he had looked, he must have seen the car but a short distance away.''

So much for the cases cited by the defendant.

The facts on which the conclusions stated in those cases were based, aside from the point that they were established by the evidence, are not comparable to the facts assumed by the District Court of Humacao and from which it derived its inferences and deductions. In *Gordon Fireproof Warehouse & Van Co.* v. *Hines, supra,* the victim of the accident did not stop the truck, which was travelling at fifteen miles an hour at the time of the accident, to look and listen, and furthermore he testified that when he saw the train coming he tried to cross the track. In *Southern Railway Co.* v. *Smith, supra,* the accident occurred during the day and all the witnesses, including those of the plaintiff, testified that they saw the train approaching, and many heard the bell ring. The plaintiff testified that he looked, in the face of unanimous testimony that the train had been seen, and of a strong showing that it had been heard. The court considered his testimony as incredible. In *May* v. *Rhode Island Co., supra,* the plaintiff himself testified that he turned to cross behind a car going west, and that his horse's head was about one foot from the rail when he looked in the direction of the car which struck him. The differences between these cases and the case at bar are so evident that we consider it unnecessary to emphasize them.

''There is no fixed standard in the law,'' says Mr. Justice Lamar in *Grand Trunk Railway* v. *Ives,* 144 U.S. 408, 417, ''by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbi-

trarily defined. What may be deemed ordinary care in one case, may, under different surroundings and circumstances, be gross negligence.'' And indeed each case has its peculiarities, its characteristic features, its special mark, its own physiognomy, and it would be no easy task to do justice if in order to determine what facts constitute ordinary care or negligence we had to follow fixed and invariable rules.

The fact that one may not see or hear in spite of having looked and listened is not necessarily evidence of contributory negligence, as is shown by the cases which we will cite presently. In *Baltimore & Ohio Railroad Co.* v. *Griffith*, 159 U.S. 603, there was involved a collision between a car driven by plaintiff's mother and the defendant's passenger train. In this case, says the Supreme Court of the United States, ''there was evidence that no bell was rung, and that the engine whistled, if at all, at the railroad bridge, almost half a mile from the crossing.'' There was a verdict for the plaintiff which the Supreme Court found justified, stating that sufficient warning had not been given, and that the collision was caused by the negligence of the persons who had charge of the train. In this same case the Court said:

''There was evidence tending to show that these women were driving slowly and with a safe horse; that the train was several minutes behind time; that as they approached the low place at which a train could be seen if one were there, they stopped to look and listen, but neither saw nor heard anything; that after stopping they started driving slowly up the hill to a point at the top between forty and fifty yards from the track, where the slope commenced, and there they stopped again and listened, but heard nothing; they then drove slowly down the hill, both listening all the time, without talking, and heard nothing; and that just as they got to the cut and the horse had his feet on the nearest rail, the train came around the curve and the collision occurred.

''Since the absence of any fault on the part of a plaintiff may be inferred from circumstances, and the disposition of persons to take care of themselves and to keep out of difficulty may properly be taken into consideration, *Railroad Company* v. *Gladmon*, 15 Wall.

401, it is impossible to hold in the light of this evidence, as matter of law, that the conduct of plaintiff was such as to defeat a recovery.''

We have cited the above case to show that the Supreme Court of the United States, in affirming the judgment of the lower court and the verdict of the jury, did not consider it incredible that the persons travelling in the carriage should not have seen or heard the approaching train, in spite of the fact that, according to their testimony, they looked and listened several times before arriving and while they approached the crossing.

In *Keese* v. *N. Y., etc., R. Co.*, 67 Barb. 205, 206, the Supreme Court of New York said:

"The plaintiff's case established proper diligence, observation, care and caution on the part of the deceased—the use of eyes and ears—before attempting to cross the defendant's track. The law does not require that the sight and ears of the wayfarer shall be immaculate or infallible, but that he shall use them to avoid injury—an incident more likely to occur than its opposite. It is not presumable, on a just consideration of the affairs of this life, that a man will use his eyes and ears to incur danger—to simulate only, and not to act—but that yielding to the instinct of self preservation he will avoid, not seek danger."

In *Wiedman* v. *Erie Railroad Co.*, 66 App. Div. 347, 351, 352, the court expressed itself as follows:

"It has been held (*Henavie* v. *N.Y.C. & H.R.R. Co.*, 166 N. Y. 280) that a railroad company which runs a locomotive rapidly in the night time upon a public street over a grade crossing without any other signal of its approach than a headlight, may be found guilty of negligence, and that a person coming into collision with such train need not as a matter of law be held guilty of contributory negligence, even though he saw such headlight.

"Neither should it be held that plaintiff, especially under the conditions of dusk or darkness prevailing at the time of the accident, was guilty of contributory negligence because he did not see over this obstruction the top of defendant's approaching train, assuming that he could so have seen it. Plaintiff is not to be charged with all of the possibilities of vision and hearing as he approached the track. He was not bound to see or provide against any certain re-

sult. He was bound simply to make all of the reasonable efforts to see and hear that a careful and prudent man would make under like circumstances.''

In *Cherry* v. *Louisiana & Arkansas Railway Co.*, 12 La. 471, 126 Am. St. Rep. 323, there was involved a collision between a mule wagon driven by a Mr. Johnson and the defendant's locomotive. In the wagon were Mr. Johnson, his son, and two grandchildren. The son escaped injury, the grandchildren died the day after the accident, and Johnson lost consciousness, although he was not seriously hurt. In said case there was a serious conflict of evidence with respect to the speed of the engine and the sounding of the whistle and bell. The accident occurred in the daytime. From the opinion rendered by the Supreme Court of Louisiana in the said case, we copy the following:

''The crew of the locomotive and one witness who first saw it when within thirty feet of the crossing, say it was going at from six to ten miles an hour; but if by this is meant that it was not going faster than was usual upon the yard, the testimony stands in opposition to that of a large number of witnesses whose attention was attracted to it. These witnesses lived in the neighborhood of this yard, and were accustomed to the noises and movements upon it, and the speed of this particular engine would not likely have attracted their attention, if it had not been unusual; and the effect upon the wagon shows that the blow must have been quick and sharp. Every spoke was broken in the two hind wheels, where the wagon was struck. One witness, of more than twelve years' experience as a locomotive engineer, says that his attention was attracted to the engine by the rapidity of its exhaust; that it shut off steam about two hundred and seventy-five yards from the crossing, and that he continued to observe it until it was about seventy-five yards of the crossing, and it was still going about twenty-five miles an hour. How far beyond the crossing the locomotive ran after the collision it is impossible to know definitely from the conflicting testimony.

'' ⁂      ⁂      ⁂ ·      ⁂      ⁂      ⁂      ⁂

''It is inconceivable that if the whistle was blown near enough to the crossing to serve for a warning, or if the bell was rung continuously, these signals would not have been heard by Johnson and by so many persons whose attention was attracted to this engine by

its unusual speed. The theory that will best reconcile the conflicting testimony on these points is that the whistle was blown too far up the track to serve as a warning, and the bell was begun to be rung too near or too late.

"Defendant has an elaborate argument with diagrams to prove that the smokestack of the locomotive protruded one and one-half feet above the long train of log piled-up cars on the other side of which the locomotive was coming, and that Johnson could have seen it. But the best proof that Johnson could not see it is that he stopped and looked and did not see it although he had good eyes and was familiar with the crossing.

" *     *     *     *     *     *     *

"One who, on a public highway, approaches a railroad track, and can neither hear nor see any indication of a moving train, is not chargeable with negligence in assuming that there is none sufficiently near to make the crossing dangerous."

In *Hahn* v. *Chicago M. & St. P. Ry. Co.*, 47 N.W. 620, the jury returned a special verdict finding the following facts: That the whistle was blown when the engine was at or near the whistling post and until it arrived at the crossing where the accident happened; that the bell was rung continuously from a point at or near the whistling post until the engine arrived at the crossing; that the engine was moving at a speed of forty five miles an hour from or near the whistling post to the scene of the accident; that the horse which pulled the plaintiff's carriage was moving at three and one-half miles an hour from a distance of two hundred feet to the place of the accident; that at one or two hundred feet from the scene of the accident, and to the east of it, an approaching engine moving in the same direction as the plaintiff could be seen from Oakton Avenue at a distance of 2,600 feet; that twenty feet away from the scene of the accident, and to the east of it, an approaching engine moving in the same direction as the plaintiff could be seen from Oakton Avenue at a distance of eight hundred feet; that the defendant was negligent and that there was no contributory negligence on the part of the plaintiff. The Supreme Court of Wisconsin

sustained the judgment of the lower court and the verdict of the jury. From the opinion of the court we copy the following:

"Both the plaintiff and the sister, who was with her in the carriage, testify that when they got within 200 feet of the crossing (measuring along the road they were travelling) they both looked up the track towards the east and west, and neither saw or heard any train. They also testify that when they crossed the first side track, a little over 100 feet from the crossing, they looked again, and saw nothing and heard nothing, and that they looked and saw nothing when between the first and second side tracks, and that the first either of them saw or heard of the engine was when the alarm was given by the coming engine near the water-tank about 400 feet from the crossing, when it was too late to avoid the injury. Other witnesses, who saw them approaching the crossing near the first side track, who passed them on the highway, say they appeared to be looking for the train, and these witnesses did not see or hear the engine approaching until the alarm was sounded near the water-tank. Others in the same vicinity, who testified, said they did not see or hear the approaching engine until the alarm was sounded near the tank. It is true some other witnesses testified that they heard the bell and the whistle when sounded near the whistling-post, and all the way to the crossing, but this evidence does not establish the fact with certainty that the plaintiff or her sister heard, or could have heard, the whistle and bell as they approached the track; it may tend to establish that fact, but it does not establish it as a matter of law,—it still remains a question of fact for the jury."

We have copied these decisions in order to show how the opinions of the courts vary with respect to the ability to see and hear, and how some cases apply a rigorous standard, while others follow a more human and liberal one. In the case just cited, one of the two women in the carriage testified that she heard the whistle when the engine was about 400 feet away from the crossing, but that this warning was too late to avoid the accident.

In *Continental Improvement Co.* v. *Stead*, 95 U.S. 161, 164, a case involving a collision between defendant's passenger train and plaintiff's wagon, Justice Bradley, speaking

for the Court, explains the mutual duties of railroad companies and persons crossing the track, thus:

". . . If a railroad crosses a common road on the same level, those traveling on either have a legal right to pass over the point of crossing, and to require due care on the part of those travelling on the other, to avoid a collision. Of course, these mutual rights have respect to other relative rights subsisting between the parties. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching wagon to make the crossing first: it is the duty of the wagon to wait for the train. The train has the preference and right of way. But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It cannot be such, if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot; but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing.

"On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care in a particular case. But notwithstanding the hazard, the infirmity of the human mind in ordinary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them,—such, namely, as an ordinarily prudent man would exercise under the circumstances. When such is the case, they cannot obtain reparation for their injuries, even though the railroad company be in fault. They are the authors of their own misfortune. These propositions are so indisputable, that they need no reference to authorities to support them. We think the judge was perfectly right,

therefore, in holding that the obligations, rights, and duties of railroads and travellers upon intersecting highways are mutual and reciprocal, and that no greater degree of care is required of the one than of the other. For, conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to their relative duties. The right of precedence referred to does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach. The duty of the wagon to yield precedence is based upon this condition. Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty. The charge of the judge was in substantial accordance with these views.

The mistake of the defendant's counsel consists in seeking to impose upon the wagon too exclusively the duty of avoiding collision, and to relieve the train too entirely from responsibility in the matter. Railway companies cannot expect this immunity so long as their tracks cross the highways of the country upon the same level. The people have the same right to travel on the ordinary highways as the railway companies have to run trains on the railroads.''

As the Supreme Court of the United States has said, those crossing the track have the greatest incentives to caution, for their lives are in imminent danger if a collision occurs, and it should not be presumed, in the absence of evidence, that they did not exercise the ordinary care which should be expected of a prudent and cautious person. In the instant case we are dealing with a freight train. There is no evidence that the plaintiff knew that the train was to pass the grade crossing at the time of the accident. This accident happened during the night, when there was no one at the crossing charged with giving warning of the approaching train. After considering and analyzing the pleadings and the evidence adduced, we do not believe that the conclusion is justified that the plaintiff must necessarily have seen and

heard, at least with sufficient time to avoid the accident. Moreover, this Court has declared in several decisions that contributory negligence is a defense which must be alleged and proved by the defendant. *Maldonado* v. *Hamilton*, 32 P.R.R. 208; *González* v. *Malgor, Luiña & Co.*, 29 P.R.R. 97; *Truyol Co.* v. *West India Oil Co.*, 26 P.R.R. 321; *Rosado* v. *Ponce Ry. & Light Co.*, 20 P.R.R. 528. This is the doctrine generally prevailing in those States which have adopted the modern system of procedure, unless the contributory negligence appears from the allegations of the complaint or from the plaintiff's evidence, in which case the defendant is not required to allege and prove what the plaintiff himself has already established. Such is not the case here. The defendant sets up in its answer, as its only defense, the allegation that the plaintiff maliciously placed the automobile on the track. This allegation, which has not been proved, can not cover any other act of negligence. The defendant can not go beyond the limits which it set itself in the answer, and must limit itself to prove the defense which was specially alleged. *Atchison T. & S. F. R. Co.* v. *Dickey*, 41 Pac. 1070; *Continental Ice Co.* v. *Mitchell*, 112 So. 239; *American Car & Foundry Co.* v. *Uss*, 211 Fed. 862; *Midland R. R. Co.* v. *Brown (Texas Court of Civil Appeals)*, 207 S. W. 340; *Heriford* v. *Kansas City Rys. Co.*, 220 S. W. 899.

In *Hall* v. *City & County of San Francisco*, 206 Pac. 459, decided by the Supreme Court of California, it was shown that the plaintiffs were in an automobile moving from south to north on Octavia Street, San Francisco. The accident occurred at 8:30 o'clock in the evening. The car was driven by one of the young men who accompanied the plaintiffs. At that moment one of the defendant's street cars was moving from east to west along Geary Street. The collision occurred at the intersection of the two streets. On these facts, the defendant moved that the court submit certain instructions

to the jury. This motion was denied. The Supreme Court of California, in affirming the judgment of the lower court, expressed itself as follows:

"The defense of contributory negligence is an affirmative defense which the defendant must plead and prove in order to obtain the benefit thereof. There was evidence to the effect that the street car had the usual lighted headlight and was plainly visible for a distance of 200 feet before it reached the crossing. The jury might well have believed that the driver of the automobile did not look in that direction, or that, seeing the car, he did not heed the danger of attempting to cross in front of it. The instruction deals almost entirely with the question of the negligence of the driver of the automobile. It had a direct tendency to lead the jury to believe that if the driver was guilty of contributory negligence the plaintiffs could not recover. To so instruct the jury would have been erroneous, in view of the fact that the defense of contributory negligence was not interposed. Without passing on the correctness of this instruction, we think that for this reason it was properly refused by the court. The other instructions of the court fully covered the subject of negligence on the part of the persons operating the street car.

The instruction is an illustration of the dangers of attempting to frame a charge to the jury upon isolated extracts from opinions of this court. It is claimed that it was taken from the opinion in *Arnold* v. *S. F., etc., Co.,* 175 Cal. 1,164 Pac. 798. In that case the court was discussing the question of contributory negligence on the part of the injured person as related to the alleged negligence of the driver of the street car. Contributory negligence was there presented as a defense, and the passages from which the instruction was taken treated of both subjects upon the correct theory that, although the motorman of the train was negligent, the plaintiff could not recover if the negligence of the injured party contributed to his injury. The language could not be applied to a case in which contributory negligence was not pleaded without having a tendency to mislead the jury into believing that it was in issue."

The provisions of our Civil Code are the source of our law with respect to negligence. We are not bound by the common law, nor by the construction given by the courts in the various States of the Union to statutes in force in their

respective jurisdictions. It is natural that we should be governed by our own statutes and that we should adopt such principles as arise from their construction and which are in harmony with our civil law. The American jurisprudence is varied and abundant, and constitutes a source of useful information for the judicial mind. By reading the adjudicated cases we can fathom the development of the doctrine of contributory negligence from its beginnings to date, without excluding comparative negligence, adopted in a number of countries whose legislation has its origin in the civil law, which was in vogue in one or two of the States of the Union and which has found a place in certain statutory provisions. The principle that a person who suffers damage by reason of his own negligence has no cause of action, is not exclusive to the common law. The civil law, from its beginning, also maintains the same principle. *Quod quis exculpa sua damnum sentit, non intelligitur dammum sentire.* Justinian's Digest, volume 3, book 50, title 17, 203. This rule has its exceptions both in the common law and in the civil law: in the former, where the humanitarian, or last clear chance, doctrine applies; in the latter, when the doctrine of comparative negligence is accepted and applied, which doctrine, without destroying the plaintiff's right of action, has the effect of reducing proportionately the amount of the indemnity. This Court has repeatedly accepted and applied the principle of contributory negligence. We do not deem it necessary to discuss at this time the scope and effect of the acceptance of this doctrine.

For the reasons stated, the motion for reconsideration must be denied.

Mr. Justice Wolf dissented.